IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| Michael Antwand Gray,<br>Plaintiff, | )<br>)<br>) |
| v. | )    1:09cv538 (AJT/IDD) |
| Officer B. O. Wages,<br>Defendant. | )<br>)<br>)<br>) |

## MEMORANDUM OPINION

Michael Antwand Gray, a Virginia prisoner proceeding pro se, filed this civil rights action, pursuant to 42 U.S.C. § 1983, alleging violation of his rights under the Fourth Amendment during a traffic stop. The matter is now before the Court on the Motion for Summary Judgment of Officer B. O. Wages, the sole defendant remaining in the lawsuit.

In his initial complaint, plaintiff alleged that his rights under the Fourth Amendment were violated during a traffic stop in the City of Suffolk. Plaintiff named as defendants Chief William Freeman and Officer B.O. Wages of the Suffolk Police Department. By Order dated June 10, 2009, plaintiff's claim against Chief Freeman was dismissed with prejudice pursuant to 28 U.S.C. § 1915A(b)(1)[1] for failure to state a claim, and plaintiff was directed to particularize and amend his

---

[1] Section 1915A provides:

(a) **Screening.**—The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
(b) **Grounds for dismissal.**—On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—
    (1) is frivolous, malicious, or fails to state a claim upon which relief can be granted; or
    (2) seeks monetary relief from a defendant who is immune from such relief.

allegations with regard to Officer Wages. Plaintiff filed an amended complaint in compliance with those directions, setting out claims of: (1) use of excessive force in violation of the Fourth Amendment against Officer Wages; (2) failure to investigate plaintiff's grievance against Sergeant Burch, Internal Affairs Supervisor for the City of Suffolk Police Department; and (3) employment of Officer Wages against the City of Suffolk. By Memorandum Opinion and Order entered August 27, 2009, plaintiff's claims against Sergeant Burch and the City of Suffolk were dismissed pursuant to 28 U.S.C. § 1915A(b)(1), and remaining defendant Officer B. O. Wages was directed to file an answer or other responsive pleadings to the complaint.

Defendant Wages filed a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 on December 1, 2009, along with a supporting brief and exhibits. Defendant also provided plaintiff with notice as required by Local Civil Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) that plaintiff could file responsive materials within twenty (20) days. On December 11, 2009, plaintiff moved for an extension of time to respond to defendant's motion, and by Order dated December 14, 2009, plaintiff was directed to submit his reply to defendant's motion on or before February 2, 2010. Plaintiff renewed an earlier request for the appointment of counsel on February 18, 2010, and his motion was denied on March 8, 2010. To date, plaintiff has filed no response to defendant's summary judgment motion. For the reasons that follow, defendant's motion for summary judgment will be granted.

## I. Background

The following material facts are uncontested. In the very early morning hours of May 4, 2008, before sunrise, the Suffolk Emergency Communications Center received a 911 call that shots were being fired from a number of vehicles in the parking lot of a 7-Eleven store on Carolina Road.

Wages Aff. ¶ 4; Colby Aff. ¶ 4; Callis Aff. ¶ 4. Shortly thereafter, a call went out from the police dispatcher that the vehicles had left the scene, and that one, an older-model white Cadillac, was heading toward downtown Suffolk. Wages Aff. ¶ 5; Callis Aff. ¶ 5. Officers Ron Colby and Debbie Callis, in separate vehicles, indicated that they had seen and were following a vehicle matching the description provided by the dispatcher. Callis Aff. ¶ 6; Colby Aff. ¶ 6. Officer Wages responded to back up Officers Callis and Colby for a felony traffic stop of the suspect vehicle. Wages Aff. ¶ 8. As she approached the Cadillac, Officer Callis engaged her lights and sirens, but instead of stopping, the vehicle proceeded on for about two blocks before pulling into a driveway on Kilby Avenue. Callis Aff. ¶ 8; Colby Aff. ¶ 7. Plaintiff was the driver of the Cadillac, which was his personal vehicle, and there also were two passengers in the car. Colby Aff. ¶¶ 8 - 9; Wages Aff. ¶¶ 12 - 13.

Officers Colby, Callis, Wages and Yolanda Spencer began to conduct a felony traffic stop of plaintiff's vehicle. Wages Aff. ¶¶ 5, 8 - 10; Colby Aff. ¶¶ 5, 7 - 10; Callis Aff. ¶¶ 5, 8, 10 - 11. Officer Colby was the controlling officer at the scene, and Officer Wages was acting as the "cover officer," positioning himself some distance from the suspect vehicle with his M4 patrol rifle to cover the occupants of the suspect vehicle. Colby Aff. ¶10; Wages Aff. ¶ 14. Officer Colby commanded the driver, plaintiff Gray, to shut off his engine, put the keys on top of the vehicle, and open the car door with his right arm while keeping his left hand on the steering wheel. Colby Aff. ¶ 10. From the beginning of the traffic stop, however, plaintiff was uncooperative. As soon as his vehicle stopped, plaintiff began screaming such things as "Why are you doing this to me?," "Get my mama," "Look what the cops are doing," and "You got no right to do this." Callis Aff. ¶ 9; Colby Aff. ¶¶ 11 - 12; Wages Aff. ¶ 18. Throughout the entire incident, plaintiff continued to scream such phrases over and over, and also engaged in "a large amount of screaming and yelling" and "generalized crying."

3

Callis Aff. ¶¶ 10, 15; Colby Aff. ¶ 13; Wages Aff. ¶ 18. It took "several minutes" for plaintiff to comply with Officer Colby's instructions to exit his vehicle, and he thereafter delayed in following Officer Colby's commands, and followed them improperly. Callis Aff. ¶¶ 9 - 17; Colby Aff. ¶ 11 - 16, 20; Wages Aff. ¶¶ 17 - 23. For example, Officer Colby directed plaintiff to walk backwards toward the officers from his vehicle, a maneuver designed to keep a suspect from determining the locations of the officers in the event he becomes violent or starts shooting, but plaintiff did so in an uncooperative fashion, continually attempting to look over his shoulder at the officers and yelling and screaming the entire time. Callis Aff. ¶ 16; Colby Aff. ¶¶ 14 - 15; Wages Aff. ¶ 17. Eventually, plaintiff complied with Officer Colby's command to kneel down with his hands on his head, and he was handcuffed. Colby Aff. ¶ 17; Callis Aff. ¶ 17; Wages Aff. ¶ 19. However, plaintiff continued to yell so loudly that the passengers in the vehicle were having trouble hearing Officer Colby's commands to them. Colby Aff. ¶ 16; Wages Aff. ¶ 20. When plaintiff was told to shut up, he responded, "No, you shut the f— up." Colby Aff. ¶ 20. By this time, numerous bystanders had gathered in response to the disturbance plaintiff was causing, and their presence "seriously complicat[ed]" the situation because they were standing within possible lines of fire if the incident were to escalate. Wages Aff. ¶ 22.

As is standard police practice when a person is kneeling with their hands handcuffed behind them, the officers began to assist plaintiff to stand. Wages Aff. ¶¶ 24 - 25. Officer Spencer first tried to get plaintiff to stand and walk towards a patrol car, and when she was unsuccessful, Officers Wages and Callis went to assist her. Callis Aff. ¶¶ 19 - 20; Wages Aff. ¶25. Gray refused to cooperate and repeatedly went limp as the officers were attempting to help him stand, which caused his arms and shoulders to slide from the officers' grasp and effectively caused him to fall to the

4

ground. Wages Aff. ¶ 26; Callis Aff. ¶23. At no point during these endeavors did Officer Wages drag plaintiff across the ground. Wages Aff. ¶ 27; Callis Aff. ¶ 24. As plaintiff and the officers neared the patrol car, plaintiff again went limp and fell forward, causing his head to hit or "glance[] off of" the headlight of Officer Callis' police cruiser. Wages Aff. ¶ 28; Callis Aff. ¶ 26. Plaintiff was then laid face down on the hood of the patrol car and searched. Wages Aff. ¶ 30. Plaintiff started trying repeatedly to hit his head into the hood of the vehicle, but Officer Callis put her hand on the hood to block plaintiff's head from coming into contact with it, to keep him from getting hurt. Callis Aff. ¶ 27. Any contact that occurred between plaintiff's head or face and the police car was the result of plaintiff's own conduct; at no time did Officer Wages hit plaintiff or attempt to push plaintiff's face into the vehicle. Callis Aff. ¶ 28. Officer Wages called his supervisor, Lieutenant Duncan, to report to the scene, because it was apparent that Gray was being deliberately uncooperative. Wages Aff. ¶ 30. When the lieutenant arrived, he spoke to both Gray and Gray's mother, who also had showed up at the scene, and explained that Gray's car matched the description of a vehicle that had been involved in a recent shooting. Wages Aff. ¶ 31; Callis Aff. ¶ 30; Colby Aff. ¶ 30. The other passengers were removed from Gray's vehicle, and when a search revealed no evidence linking Gray or his passengers to the shooting, all were allowed to leave. Wages Aff. ¶ 32; Callis Aff. ¶31; Colby Aff. ¶ 29. Plaintiff's mother advised plaintiff to "shut the hell up, get in your car, and go home," and plaintiff left the scene. Wages Aff. ¶ 33. Beyond "a few minor scrapes," Gray was uninjured in the incident, and Wages attests that at no time did he tackle, hit or scratch plaintiff or attempt to hit plaintiff's face or head against the police cruiser. Wages Aff. ¶ 34.

## II. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that judgment on the pleadings is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (moving party bears the burden of persuasion on all relevant issues). To meet that burden, the moving party must demonstrate that no genuine issues of material fact are present for resolution. Id. at 322. Once a moving party has met its burden to show that it is entitled to judgment as a matter of law, the burden then shifts to the non-moving party to point out the specific facts which create disputed factual issues. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Those facts which the moving party bears the burden of proving are facts which are material. "[T]he substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. An issue of material fact is genuine when, "the evidence ... create[s] [a] fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the non-moving party. Matsushita, 475 U.S. at 587.

## III. Analysis

Summary judgment in favor of defendant Wages is appropriate because the pleadings, affidavits, and exhibits on file demonstrate that the amount of force he used in restraining plaintiff was reasonable given the circumstances. In Graham v. Connor, 490 U.S. 386, 394 (1989), the Supreme Court instructed that "[i]n addressing an excessive force claim brought under [42 U.S.C.] § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Essential to this determination is plaintiff's status - whether he was an arrestee or a pre-trial detainee - at the time of the use of force. Id. The Fourth Amendment governs claims of excessive force during the course of an arrest, investigatory stop, or other "seizure" of a person. Id. at 388. A pre-trial detainee, however, is entitled to the protections of the Due Process Clause of the Fourteenth Amendment. United States v. Cobb, 905 F.2d 784, 788 (4th Cir. 1990). In Riley v. Dorton, 115 F.3d 1159, 1161 (4th Cir. 1997), the United States Court of Appeals for the Fourth Circuit instructed that a person is an "arrestee" when an officer decides to detain him and that the Fourth Amendment applies only to the single act of the arrest.

Clearly, under the uncontested facts in this record, plaintiff was an "arrestee" at the time of the events giving rise to his complaint. Accordingly, his claim of excessive force properly is analyzed under the Fourth Amendment's standard of reasonableness. See Vathekan v. Prince George's County, 154 F.3d 173, 178 (4th Cir. 1998). This standard takes into account the severity of the alleged crime for which the person is being detained, whether the suspect poses a threat to the safety of the police officers or others, and whether the suspect was attempting to evade arrest by flight or actively resisting arrest. Graham, 490 U.S. at 396; see Foote v. Dunagan, 33 F.3d 445 (4th Cir. 1994). The reasonableness of the use of force "must be judged from the perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 at 396, citing Terry v. Ohio, 392 U.S. 1, 20 - 22 (1968). To assess the objective reasonableness of the force used, a court must look at the salient events "in full context, with an eye toward the proportionality of the force in light of all the circumstances." Thomas v. Harmon, 2005 WL 5714146 at * 3 - 4 (E.D.Va. Dec. 5, 2005) (Brinkema, J.), aff'd, 192 Fed.Appx. 209 (4th Cir. 2006).

Here, it is uncontroverted that the officers used a bare minimum of force in detaining plaintiff. They were faced with a vehicle containing multiple occupants suspected of having just left the scene of a shooting. It was dark, and they were located near a residence and surrounded by a crowd of bystanders. Plaintiff was uncooperative with the officers, and continually screamed, cursed, and cried as the events unfolded. The officers finally managed to handcuff Gray as he knelt on the ground, but when they attempted to assist Gray to stand, Gray continued his lack of cooperation and repeatedly went limp and fell to the ground as the officers attempted to secure him in a patrol car. The officers involved, including defendant Wages, placed only their hands and arms on Gary's arms and shoulders in endeavoring to guide him to the police cruiser. Given the totality of the circumstances they faced, the actions of the officers, including defendant Wages, were not objectively unreasonable. See, e.g., Saucier v. Katz, 533 U.S. 194, 205 (2001) ("Because 'police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation,' the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective.") (citations omitted) (quoting Graham, 490 U.S. at 395); see also Crumley v. St. Paul, 324 F.3d 1003, 1007 (8th Cir. 2003) (noting that the right to make an arrest or stop necessarily encompasses the right to use some degree of force to effect it). That being so, no

violation of plaintiff's rights under the Fourth Amendment occurred, <u>Altman v. City of High Point, N.C.</u>, 330 F.3d 194, 205 (4th Cir. 2003), and defendant is entitled to the summary judgment he seeks.

Because defendant has established his entitlement to judgment as a matter of law on plaintiff's claim of excessive force, it is unnecessary for the Court to address his arguments on the question of qualified immunity.

## IV. Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment will be granted, and summary judgment will be entered in his favor. An appropriate Order and Judgment shall issue.

Entered this 9th day of August 2010.

Alexandria, Virginia

Anthony J. Trenga
United States District Judge